*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JONATHAN ERNEST MANWELL,

      Defendant-Appellant.

UNPUBLISHED
August 11, 2022

No. 333916
Macomb Circuit Court
LC No. 2015-002139-FC

## ON REMAND

Before: JANSEN, P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

This case is before us pursuant to a second remand from our Supreme Court for reconsideration in light of *People v Hawkins*, 507 Mich 949; 959 NW2d 179 (2021).[1] As with the prior remand, the issue for reconsideration concerns the testimony of Children's Protective Services (CPS) worker, Jennifer Raleigh, and the testimony of Detective John Newman. We again affirm.

As indicated in our first opinion, defendant was convicted of sexually abusing his daughter, DM, and this Court affirmed defendant's convictions.[2] In affirming, this Court found that challenged testimony of both CPS worker Jennifer Raleigh and Detective John Newman was admissible lay opinion testimony under MRE 701 and that the testimony did not constitute improper vouching for DM's credibility. *People v Manwell*, unpublished per curiam opinion of the Court of Appeals, issued February, 22, 2018, p 4-9 (Docket No. 333916) ("*Manwell I*"). This Court further concluded that any objection to the challenged testimony would have been futile because the testimony was not inadmissible, such that trial counsel was not ineffective for failing

---

[1] *People v Manwell*, ___ Mich ___ (2022).

[2] *People v Manwell*, unpublished per curiam opinion of the Court of Appeals, issued February, 22, 2018 (Docket No. 333916) ("*Manwell I*").

to object to these witnesses' testimony. *Id.*, unpub op at 4. This Court noted that some of the allegedly objectionable testimony was elicited by defense counsel, but this Court held that the questions "were clearly strategic and defendant has not overcome the presumption of sound strategy." *Id*, unpub op at 7, 9.

In an order dated July 1, 2020, the Supreme Court vacated Parts III and IV of this Court's opinion and remanded the case "for reconsideration in light of *People v Thorpe*, 504 Mich 230 (2019), and *People v Harbison*, 504 Mich 230 (2019)." *People v Manwell*, 505 Mich 1135; 944 NW2d 720 (2020). On remand, this Court held that *Thorpe* and *Harbison* did not require a different outcome because neither Detective Newman's nor Raleigh's testimony run afoul of the principles set forth in those cases. *People v Manwell*, unpublished per curiam opinion of the Court of Appeals, issued October 29, 2020, p 5 (Docket No. 333916) ("*Manwell II*").

Defendant, proceeding *in propria persona*, applied for leave to appeal *Manwell II* to the Supreme Court. In an order dated April 2, 2021, the Supreme Court held the application in abeyance pending that Court's decision in *People v Hawkins*. *People v Manwell*, ___ Mich ___; 956 NW2d 235 (2021). The Supreme Court decided *Hawkins* on May 28, 2021 and has now directed this Court to reconsider our opinion in *Manwell II* in light of *Hawkins*.[3]

In *People v Hawkins (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued March 3, 2020 (Docket No. 339020), the defendant argued that he was denied the effective assistance of counsel because his trial counsel failed to object to testimony by the investigating detective that vouched for the complainant's credibility. This Court agreed that the testimony was improper, but concluded that the defendant was not prejudiced by counsel's failure to object. This Court noted that the "**improper testimony played only a minor role at the trial, and its admission does not undermine our confidence in the jury's verdict**." *Id.*, unpub op at 2 (emphasis in original). This Court explained that the detective "described how he tried to disprove [the complainant] BW's allegations through strategic interview questions and then opined that her statements 'seemed' authentic." Defendant and BW both testified, enabling the jury to independently assess their credibility. This Court emphasized that "**the challenged testimony was not discussed again at any point in the trial; neither party mentioned it in closing.**" *Id*. (emphasis in original). This Court concluded that the problematic testimony was too brief to establish a probability that trial counsel's objection would have resulted in a more favorable outcome. *Id*.

Our Supreme Court held that this Court "erred by holding that there was not a reasonable probability that the outcome of the trial would have been different had trial counsel objected to its admission." *Hawkins*, 507 Mich 949. The Court stated:

> In this case, the prosecution called a police detective who testified that he had years
> of experience investigating child sexual assault cases, that he was trained in forensic

---

[3] On May 18, 2022, this Court entered an order in this matter permitting plaintiff to file a supplemental brief for purposes of the second remand and permitting defendant to file a responsive brief. Both parties have filed their respective briefs and this Court has considered both briefs in deciding this matter on second remand.

interviewing of child sexual assault complainants, and that he had conducted hundreds of such interviews over the course of his career. The detective then testified that the complainant's demeanor during her interview was consistent with that of a typical child sexual assault victim and that, given his specialized training, the complainant's testimony "seemed authentic to [him]." In addition, the detective testified that he tried but was unable to find inconsistencies in the complainant's allegations, stating, "[I]f I can't prove that [the abuse] didn't happen, then there's a good possibility that it did," seemingly shifting the burden of proof to defendant to prove his innocence. The detective also testified that, on the basis of his investigation, he found defendant's suggestion that the complainant made up the abuse allegations to get her father's attention to be "[n]ot true." As the Court of Appeals in this case recognized, this testimony by a police officer witness improperly vouched for the complainant's credibility and improperly commented on the defendant's guilt. . . . We can conceive of no strategic reason for defense counsel to fail to object to this improper testimony. [*Id*.]

In its order, the Supreme Court also clarified application of the second prong of an ineffective-assistance-of-counsel claim, stating:

We further conclude that, but for this deficiency in defense counsel's performance, there is a reasonable probability that the outcome of the trial would have been different. See *Strickland v Washington*, 466 US 668, 693-694, 104 S Ct 2052, 80 L Ed 2d 674 (1984) (stating that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case" and that "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome"); *People v Trakhtenberg*, 493 Mich 38, 42-43, 826 NW2d 136 (2012). [*Hawkins*, 507 Mich at 949.]

The Supreme Court concluded that the trial was a straight credibility contest because there were no third-party witnesses or physical evidence, that the prosecution's case thus hinged heavily on whether the jury believed the complainant's version of events and, that "given the nature of the detective's testimony, there is a reasonable probability that the wrongful admission of the testimony affected the outcome of the trial." *Id*.

Preliminarily, one factor that distinguishes this case from *Hawkins* is that, in *Hawkins*, there was no disagreement that the challenged testimony was improper. In that case, this Court had agreed that the challenged testimony was improper and that defense counsel performed deficiently by failing to object. The focus of this Court's decision in *Hawkins (On Remand)*, and the Supreme Court's order in *Hawkins*, concerned whether the defendant was prejudiced by counsel's failure to object. Conversely, in *Manwell I*, unpub op at 7, this Court concluded that "there was no improper expert testimony, or improper use of lay opinion testimony," and it also rejected defendant's arguments that these witnesses' testimony improperly bolstered DM's credibility. Similarly, in *Manwell II*, unpub op at 5, this Court, on reconsideration in light of *Thorpe* and *Harbison*, concluded that neither Newman's nor Raleigh's testimony run afoul of the principles set forth in those cases.

Addressing the substance of the Supreme Court's decision in *Hawkins*, we note that the Supreme Court identified the following aspects of the police detective's testimony that were deemed improper in that matter:

> The detective stated that the complainant's interview statements "seemed authentic to [him]."

> The detective "testified that he tried but was unable to find inconsistencies in the complainant's allegations."

> The detective stated, "[I]f I can't prove that [the abuse] didn't happen, then there's a good possibility that it did."

> The detective "testified that, on the basis of his investigation, he found defendant's suggestion that the complainant made up the abuse allegations to get her father's attention to be '[n]ot true.' "

We do not find any statements in Raleigh's testimony that are comparable to the statements that the Court in *Hawkins* deemed improper vouching for the complainant's credibility or improper commentary on the defendant's guilt.

It is true that Raleigh testified that her job duties included substantiating or not substantiating allegations of child sexual abuse. However, to the extent that a jury could infer that Raleigh must have substantiated DM's allegations, i.e., determined that they were truthful, merely because defendant was on trial, we do not believe that this is any different from a jury inferring that a police officer or prosecutor must have determined that a defendant was guilty, otherwise he would not be on trial.

Additionally, Raleigh's statements that DM's visible discomfort and difficulty talking was common in children's interviews was not a comment on DM's credibility. Nothing Raleigh said associated discomfort with truthfulness or untruthfulness. The jury could find that DM's visible discomfort and difficulty talking could be viewed as being supportive of the defense theory that DM fabricated the allegations and then lost control of her false accusation when numerous other authorities became involved. It was therefore not impermissible vouching for the prosecution to present evidence that such discomfort and difficulty talking was common in children's interviews. Similarly, Raleigh's statements on cross-examination that persons under stress might not recall details from recent events did not vouch for DM's credibility. Indeed, Raleigh admitted that she did not know whether DM forgot that defendant digitally penetrated her the night before or if she omitted this fact because it never happened.

Raleigh's statements on cross-examination that she never caught a child lying about what she felt during an incident of sexual abuse is arguably more problematic because it essentially meant that if a child described what she felt, the description must be accurate. However, this line of questioning did not pertain generally to DM's truthfulness, but to the specific discrepancy between her trial testimony that defendant digitally penetrated her on March 17 and her statements on March 18 that did not include digital penetration. We do not construe this statement as vouching.

-4-

In sum, we do not believe that the limited analysis in *Hawkins* changes this Court's previous conclusions that Raleigh's testimony did not stray into inappropriate vouching for DM's credibility or improper commentary on defendant's guilt. Accordingly, defense counsel was not ineffective by failing to object to Raleigh's testimony.

With respect to Detective Newman, he testified that defendant's behavior was "bizarre" during his interview and that he had never experienced a similar interview. According to Detective Newman, defendant displayed "manic states," varying between "being kind of all over the place to being more focused, and emotional to maybe unemotional." Detective Newman also testified that DM "seemed very scared" and "upset." She did not disclose that penetration occurred until Detective Newman asked her if defendant "ever put his finger inside you?" She responded, "Yes," but she would not answer when Detective Newman asked how many times it occurred. He asked her if it occurred "once or more than once?" She replied, "More than once." Detective Newman tried to elicit from her the number of incidents involving penetration, but DM did not say anything more specific, other than that it happened more than once. Detective Newman further testified that DM avoided making eye contact, which was "[t]ypical of victims:"

> *Q.* She avoided eye contact with you. You indicated that is typical?
>
> *A.* Yes.
>
> *Q.* Okay.
>
> *A.* Sometimes they feel ashamed.
>
> *Q.* Does that make any type of inference to you?
>
> *A.* That she was confused and she was ashamed. She didn't want to talk about it. She stated when she left she didn't want him to get in trouble. He was her buddy.
>
> *Q.* That is a normal response for somebody who has been abused based on your experience?
>
> *A.* Yes.

Detective Newman's testimony that DM's avoidance of eye contact was "typical of victims" was not a direct comment on her credibility; it explained behavior he observed during his interview of DM and provided the jury with a basis for determining whether such behavior was commonly seen in other persons who were alleged crime victims. To the extent that his additional testimony that he inferred that DM was confused, ashamed, and reluctant for defendant to get into trouble could be viewed as improper, it appears equally consistent with emotions she would exhibit if falsely accusing defendant.

On cross-examination, defense counsel asked Detective Newman if he discovered anything in his investigation that was inconsistent with defendant's statements. Detective Newman replied, "Yes, that he didn't touch his daughter." This could be considered an improper, nearly direct assertion that Detective Newman believed DM's allegations and disbelieved defendant's denials. However, this testimony was elicited by defense counsel, who immediately confronted the

testimony. Defense counsel asked Detective Newman, "That is your conclusion, but you don't have anything that you can point to, at the ladies and gentlemen of the jury in terms of evidentiary value. Just you have your feeling?" He replied, "Correct." Defense counsel continued:

> *Q*. Do you have any reason to dispute that or provide to the jury; he came with some sort of academy performance in mind? Do you have any reason to deny that?

> *A*. No.

Defense counsel also insinuated that DM's demeanor was similar to defendant's but that Detective Newman inferred that defendant's behavior suggested dishonesty while DM's did not. The record discloses that it was defense counsel who questioned Detective Newman about matters that led Detective Newman to question defendant's credibility but credit DM's allegations. The record also indicates that this was done as part of a strategy to discredit Detective Newman's impartiality and to demonstrate bias in his investigation, such as by demonstrating that the behavioral traits that he used to infer dishonesty with defendant's denials were the same traits that led him to infer honesty in DM's allegations. Defense counsel asked:

> *Q*. So yet you found her consistent in everything with the same body actions, lack of eye contact that you now attribute, saying to my client [DM] exercising [sic] the same thing?

> *A*. Yes.

Defense counsel then asked Detective Newman if he had "academic training in human behavior," such as a degree in psychology. He replied that he was "trained in the police academy to try to read body language mostly to help recognize threats" and "to read people, what they are thinking." Defense counsel continued:

> *Q*. Now, can you tell the jury that you think if one of the four people came into the police station and were questioned would you expect not to see nervous or perhaps at least 12 out of the 14 of some sort?

> *A*. I wouldn't put a number on it. It wouldn't surprise me.

> *Q*. It's a, probably par for the course when people probably like here, being nervous in court, right?

> *A*. Yes. I'm nervous now.

This line of questioning was part of an apparent strategy to demonstrate that Detective Newman had no special qualifications for evaluating a person's honesty. While the questioning may appear in retrospect to be a misstep because Detective Newman replied that he had received training "to read body language" and "to read people, what they are thinking," "[a] reviewing court must not evaluate counsel's decisions with the benefit of hindsight." *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004). And although the question led to Detective Newman's implication that he applied specialized knowledge to interpret defendant's and DM's body

language during their interviews, defense counsel compensated by eliciting his admission that many persons show signs of nervousness in police interviews and court testimony.

In sum, although Detective Newman's testimony occasionally indicated that he believed DM's allegations and that he assumed himself capable of assessing witnesses' credibility, it was mostly defense counsel who elicited this testimony and defense counsel challenged these assumptions on cross-examination. Defense counsel did not object, but he did not fail to respond to improper testimony. Thus, we conclude that *Hawkins* does not affect the disposition of this case.

Affirmed.

/s/ Kathleen Jansen
/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro